UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                          PLAINTIFF

v.                              CRIMINAL ACTION NO. 3:21-CR-00031-BJB-1

JOHN F. JOHNSON                                                   DEFENDANT

## UNITED STATES SENTENCING MEMORANDUM
## ELECTRONICALLY FILED

The United States submits this sentencing memorandum for sentencing currently

scheduled for November 9, 2022 in Louisville, Kentucky.   A jury convicted Defendant John F.

Johnson of violating 18 U.S.C. § 111 and § 924(c) on May 27, 2022 in United States District

Court in Louisville, Kentucky after a five day trial.

### A.    STATEMENT FACTS

On September 4, 2020, two federally deputized task force officers (TFO) for Louisville

Metro Police Department (LMPD), along with three other LMPD officers, were on top of the

Old Louisville Jail building which houses, among other agencies, the Jefferson County

Commonwealth Attorney's Office, the Jefferson County Grand Jury facilities, and LMPD

components.  The building is also referred to the as the Grand Jury building.

September 4, 2020, was Oaks Day and the day before the Kentucky Derby which had

been moved from the Spring to the Fall due to COVID-19.   On that day federal, state, and local

law enforcement were positioned throughout Jefferson County to react to expected civil unrest

aimed against the Kentucky Oaks and Kentucky Derby. At about 8:30 pm, Johnson, also known

as Grand Master Jay, along with several members of the "Not Fucking Around Coalition" (NFAC), assembled at Armory Place next to the Old Louisville Jail Building. Johnson was armed with an  AR-15 rifle with a tactical flashlight on it that was shining.

Several officers, including the two FBI TFOs, were in LMPD offices located in the Old Louisville Jail Building when they heard LMPD radio traffic about Johnson and armed NFAC members gathering on Armory Place adjacent to their building.   They immediately deployed to the roof to observe Johnson and the NFAC members after hearing the radio traffic.

When the two TFOs and three LMPD officers arrived on the roof of the building they leaned over to observe Johnson's activities on Armory Place.   Trial. Tr. Vol. 3-A, 95 (ECF No. 78).   One of the officers, Sgt. Nett, leaned over the ledge of the roof and was the first person Johnson pointed the rifle at. *Id*. at 37, 39.  Sgt. Nett had on a ballistic vest with a reflective police placard on it.  Sgt. Nett's reflective vest would have shown Johnson, because of the light on Johnson's rifle, that Sgt. Nett was a law enforcement officer.

Sgt. Nett leaned over, and Johnson's weapon mounted with the light hit him, "which caused him [Sgt. Nett] great alarm." *Id.* at 31.  "So as the light hit me in the face, my immediate gut was 'I got to get away from this ledge.'  I was also blinded by it, so I couldn't even respond to it immediately, so I immediately pulled back from the edge to give myself some cover behind that rail. . ." *Id.*  "When you have a rifle pointed at your head, you kind of change what you're doing.  So I tried to stay back from the edge more to give myself some cover." *Id.* at 45.   "I was shocked.  Again, the light hit me, it blinded me, it kind of took me off for a minute.  So when I backed up and just listened to Detective Claxon, you know, start acknowledging what was going on, I was shocked, I was fearful." *Id.*  at 57.

2

FBI TFO Scott Claxon was also present on the roof performing his duties as an FBI TFO, he was part of the security detail, and he had helped prepare the operations plan for the FBI. Trial. Tr. Vol. 3-B, 119, 120 (ECF No. 73).   FBI TFO Claxon "looked over just in time to see a rifle wing and see a flashlight blind me.  I recognized it for what it was.  I stepped back for a second, peeked back over, saw it come again." *Id.* at 131. "We needed to observe from a better position of cover at this point.  If we're getting a rifle pointed at us, we need to be aware of cover, putting something between us that will hopefully stop a bullet.  And it's also gonna make us less inclined to stick our head out to see what's going on.  It's a bit risker now." *Id.* at 140-141.  TFO Claxon was within the effective range of the AR-15 and ducked back and took cover because Johnson pointed a rifle at them.  *Id.* at 58-59.

Det. John Daniel was also on the grand jury building roof as Johnson pointed an AR-15 assault rifle at the officers.  He testified that he considered that anytime a rifle was pointed at someone it was a threat.  Trial. Tr. Vol. 3-B, 95 (ECF No. 73).  He considered a weapon with a flashlight the same as a weapon.  Det. Daniel saw Johnson continue to point the rifle at the roofline and "close the distance" between himself and the police officers on the roof.  *Id*. at 96.  Det. Daniel said he and the other officers were within the effective range of the AR-15.  *Id*. at 95.

Law enforcement officers also testified that they saw Johnson's right hand making motions on the right side of his rifle that were consistent with Johnson manipulating the selector switch on the rifle from either safe to fire or fire to safe.   Trial. Tr. Vol. 3-B, 99-100 (ECF No. 73).  Specifically, Sgt. Nett saw Johnson hand move as if he were manipulating the selector switch, and that he (Sgt. Nett) was within the effective range of Johnson's AR-15.  Trial. Tr. Vol. 3-A, 48-49, 55-56 (ECF No. 78).  TFO Claxon also saw Johnson's hand motions as consistent with manipulating the safety of the gun. Trial. Tr. Vol. 3-B, 140 (ECF No. 73).

3

The evidence submitted at trial showed that Johnson was familiar with downtown Louisville area.  Johnson conducted an advance visit on July 24, 2020, and on July 25, 2020, he conducted a march through downtown Louisville. Trial. Tr. Vol. 3-B, 32-34 (ECF No. 73).  On July 25, 2020, he gave a lengthy video recorded speech in the center of downtown from the Metro Hall stairs that are in front of the grand jury building and Jefferson Square Park.  *See* Exhibits 4B and 4C.

Prior to traveling to Louisville, Johnson had web ex conversations with city leadership including LMPD Major Aubrey Gregory, Margaret Brosko, Louisville Metro Government Senior Advisor to the Mayor and member of the Community Engagement Team, and Jesse Halliday, Special Advisor to LMPD, among others. Trial. Tr. Vol. 3-B, 28-29 (ECF No. 73).  Through these conversations, Johnson was placed on notice that there would be police and snipers on roofs.  The number one topic with Major Gregory was firearm safety, and he told Johnson that pointing a weapon at police would be perceived as a threat by the police.  Trial. Tr. Vol. 2, 60-61 (ECF No. 77).  Johnson had been warned about police and snipers being on roof tops on more than one occasion by Major Aubrey Gregory. *Id.* at 60.   Major Gregory warned Johnson not to carry loaded firearms or firearms in a position that could readily fire--known as the "high ready". *Id.* at 62-63.  Again, Major Gregory advised Johnson that officers would be on roof tops of surrounding buildings and admonished Johnson to not point weapons at the officers as it would be perceived as a threat.[1] Johnson told Major Gregory he was going to send an advance recon team to Louisville on July 24, 2020. *Id.* at 67.

---

[1] Q:  When you say "threat", what are you talking about?
A:  Pointing a gun at a cop.
Q:  Okay.  And did you explain to him how—how dangerous that could be?
A: Yes.  I thought I made it perfectly clear how dangerous that could be, and I also explained to him that the best way to prevent that were to make sure his people carried their weapon at the low ready.
Trial. Tr. Vol. 2, 60-61 (ECF No. 77).

On July 25, 2020, NFAC marched through downtown Louisville traveling east bound on West Jefferson Street passing obvious governmental buildings with law enforcement presence. Trial. Tr. Vol. 2, 84 (ECF No. 77).   The formation marched past multiple municipal government and law enforcement buildings until Johnson reached the Metro Hall where he had arranged to deliver a speech to his followers.  Located directly in front of Metro Hall was Jefferson Square Park, the site of protests and a Breonna Taylor memorial.  In addition, directly in front of Metro Hall across from the park was the grand jury building with lights and speakers on top used by police to communicate with the crowd below (the building is also known as the old jail building and Commonwealth Attorney's Office).

> Q:  Okay.  And if he was looking south, what would he have seen?
> A:  He would have seen the grand jury building.
> Q:  And who was on top of the grand jury building?
> A:  Law enforcement officers.

Trial. Tr. Vol. 2, 88, 107 (ECF No. 77).

On July 25, 2020, Johnson proceeded to deliver a video recorded speech to the assembled crowd where he acknowledged police presence.  The United States introduced Exhibits 4B and 4C as excerpts from Johnson speech.  In Exhibit 4B Johnson tells the NFAC to check the roof and assume the position – "I don't know who the fuck you are but you're about to get shot". Johnson is looking directly south at the location of the grand jury building.

In another excerpt from Johnson's July 25, 2020 speech, introduced as Exhibit 4C, he even acknowledged federal agents.  He said,

> Stop lying on us.  While we here stop attacking the messenger.  Did you get the motherfucking message?  So I got to thank all these snipers, all these motherfuckers on the roof [Johnson points] . . . that's protecting us.  They wear the uniform that you all hate.  They're protecting us.   We got everybody out here today ya'll, we got the department of homeland security… FBI, ya'll need new cars and new haircuts, shit we even seen the IRS."

Several witnesses were present to witness Johnson's speech on July 25, 2020, and witnessed police on top of the grand jury building.   U.S. Secret Service TFO Pohl testified there were police on the grand jury building on July 25, 2020.  Trial. Tr. Vol. 3-B, 48, (ECF No. 73). Margaret Brosko witnessed Johnson's speech from Jefferson Square Park and based on the photograph of Johnson in Exhibit 4B, she testified Johnson was looking south at the grand jury building. Trial. Tr. Vol. 3-B, 34-35 (ECF No. 73).   She confirmed that she saw police on the rooftop of the grand jury building on July 25, 2020.  *Id.* at 38.    TFO Claxon testified that he was in the Grand Jury building on September 4, 2020, and there were SWAT on the roof.  Trial. Tr. Vol. 3-B, 121 (ECF No. 73).  Major Gregory testified there were law enforcement officers on the grand jury building on July 25, 2020. Trial. Tr. Vol. 2, 78 (ECF No. 77).  TFO Dave Dobson testified he was on an adjacent rooftop, and he could see that there were "Loud speakers, lights, police" on the grand jury building.   Trial. Tr. Vol. 2, 184 (ECF No. 77).  TFO Dobson testified that the snipers Johnson was referring to were law enforcement snipers on the grand jury building.  *Id.* at 186.  Johnson was admonished in a phone call from Major Gregory on July 26, 2020.  Major Gregory told Johnson that he was not happy with weapons safety on the 25th.  Trial. Tr. Vol. 2, 115 (ECF No. 77).

Johnson and the NFAC came back to Louisville on September 4, 2020. Again, prior to Johnson and NFAC's arrival in Louisville, additional coordination phone calls and video conferences occurred between Johnson, Major Gregory, and others. Trial. Tr. Vol. 2, 117-119 (ECF No. 77).  Major Gregory again advised Johnson that law enforcement officers would be on rooftops of buildings to include buildings downtown and in the area of Churchill Downs. *Id.* at 118.  Major Gregory also admonished Johnson again to not point weapons at the officers as it would be perceived as a threat by the officers.  *Id.* at 118.  Louisville Metro Council President

David James testified that the location of Johnson July 25, 2020, march was surrounded by government buildings and increased police presence, including police on roof tops.  Trial. Tr. Vol. 3-A, 96,97, 98 (ECF No. 78).  The same situation with police presence was present on September 4, 2020. *Id.* at 98.

Video recorded evidence documented Johnson's arrival to Armory Place on September 4, 2020.  Sgt. Nett detailed Johnson's arrival on September 4, 2020 based on camera footage showing Johnson's travel path.  He could see Jefferson Square Park and Metro Hall, where Johnson had given his speech on July 25, 2020.  Trial. Tr. Vol. 3-A, 11-18 (ECF No. 78). Johnson drove down liberty street past Metro Corrections, an obvious law enforcement building, and stopped at a light where he could see Jefferson Square Park and Metro Hall.  See Exhibit 6A. Another angle showed Johnson following Lebron Seay on Liberty and Seay exiting the vehicle to point out Jefferson Square Park to Johnson. *See* Exhibit 7A.   Also visible from the street was Metro Hall where Johnson delivered his July 25, 2020 speech.  Exhibit 8A showed Johnson's car turning right on Armory place and driving past three signs indicating Commonwealth Attorney's Office parking on the right side.  *See* Exhibit 8A; Exhibit 9E; Trial. Tr. Vol. 2, 95 (ECF No. 77). No one parked in front of the Commonwealth Attorney's Office parking only signs. *Id.*

Video Exhibit 8B was a video from the real time crime center camera of Johnson on Armory Place on September 4, 2020.  The video shows Johnson pointing an AR-15 rifle with a weapon with a mounted light at the roof line of the grand jury building where police were stationed.  Johnson is captured on video exiting the driver's side of his grey SUV.  *See* Exhibit 8B.  Shortly thereafter, Johnson is captured on video turning on his weapon's mounted light and shouldering a rifle.  He then points the shouldered rifle at the roofline of the grand jury building and sweeps the roof line.

SA Andrew Phillips testified to the FBI investigation that was opened on September 16, 2020. Trial. Tr. Vol. 4, 7, 9 (ECF No. 79).   He obtained paperwork showing TFO Claxon was a federally deputized TFO for the FBI.  He also verified that TFO Claxon was performing his federal duties at the time.  *Id.* at 11.   SA Phillips conducted a re-creation of the officers standing on top of the roof of the grand jury building wearing what they were wearing on September 4, 2020.  *Id.* at 13.   He took photographs of the officers in their clothes and vests and took photographs of the officers on the roof.  He also used a range finder to calculate distances from the Johnson's location to the location of the officers.  *Id.* at 16.   He observed Sgt. Tim Nett wearing a vest with reflective police placard.  *Id.* at 22.   SA Phillips also said that he retraced Johnson's path to arrive at Armory Place in downtown Louisville.  *Id.* at 80-81.

The FBI executed a search warrant at Johnson's residence on December 3, 2020.  They recovered the same firearm he had with him on September 4, 2020 with a round in the chamber laying on his bedroom floor.  *Id.* at 51-52. FBI firearms examiner Aimee Quila testified she examined Johnson's AR-15 and that it fired a projectile and was a functioning firearm.  Trial. Tr. Vol. 2, 239 (ECF No. 77).   SA Phillips Mirandized Johnson and obtained a signed Miranda waiver.  Johnson waived his rights and consented to an interview.  The interview was audio recorded, and clips of the interview were introduced at trial.  *Id*. at 53.

During the interview, Johnson claimed he was told there were guys or teenagers on the roof at the time by Lebron Seay.  *Id.* at 63.   The video introduced as Exhibit 8B showed that Lebron Seay was on his phone the whole time.  *See* Exhibit 8B.  Johnson also claimed he had to shine a light up there because he was the only one with a light.  The video shows at least two other individuals had weapon mounted lights, and they did not point a rifle at the roof.  Trial. Tr. Vol. 4, 71 (ECF No. 79).  Johnson also claimed his gun was on safe and that no round was

chambered. *Id.* at 71.   Finally, Johnson claimed he had heard that teenagers with paintball guns

were on the roof and that they posed no threat to him. *Id.* at 63, 78-79.

SA Phillips introduced Exhibit 29E containing Johnsons statements. *Id.* at 63:

> JOHNSON (JJ)        Right, like he knew she was going to come out because he
> was on the phone with her. There were some, uh, there were some guys on top of
> the building. Um, somebody said they had paint guns or something like that. That
> that had been a problem downtown, that somebody was shooting people with
> paint guns. Uh, I remember he said if you see guys up there just pay attention.
> They're shooting guys with paint guns. They're not real guns, blah-blah-blah.
> Um, that was all he really told us about the area. Then we met Jessie and (UI).

Trial. Tr. Vol. 4, 63 (ECF No. 79).

> JJ   And every story-and every story that I read about the air ball guns or the paint
> guns, it (UI) turned out to be teenagers. (UI) I mean, LMPD has gone up there and
> gotten guys down off the roof and they were teenagers. So it's (UI) I've read the
> stories already, so I'm assuming these must be teenagers. They're no threat.
> DP   Okay. So they're not a threat…
> JJ    But we still got to let them know that we see (UI). So if you're going to bust
> us in our ass while we're walking with the paint guns, teenagers, we see you.

Trial. Tr. Vol. 4, 78-79 (ECF No. 79).

SA Phillips also introduced Exhibit 29I in which Johnson described how he could scare

children with his AR-15 assault style rifle:

> JJ     Let's find out who it is. Let's not just jump the gun. Everybody's not a
> terrorist. Everybody's not a militia. Everybody's not law enforcement.
> Everybody's not…but let's find out who it is. And if these are kids doing it, you
> *can scare kids away very easily*. You know? Shine a light. That's all we had at the
> moment. At that moment.

(Underline and italics emphasis added).

FBI Special Agent Orrin Ambrose participated in the search of Johnson's home on

December 3, 2020.  Trial. Tr. Vol. 2, 195 (ECF No. 77).    He also introduced YouTube videos of

Johnson expressing his intent to engage in violence against law enforcement and encouraging

others to engage in violence against law enforcement titled

"NFAC_MESSAGE_TO_MINNEAPOLIS_PART_2" .  Trial. Tr. Vol. 2, 221-223 (ECF No.

77).    In Exhibit 31A, Johnson expressed intent to commit violence against law enforcement:

> "Going forward you kill us we gonna kill you, point fucking blank. If we can't get to you, we'll go after your family members. If we can't get them, we're gonna go after your church members. If we can't get them, we're gonna go after your co-workers and if we can't get them, fuck it, we'll just go after anybody."

In Exhibit 31B, Johnson similar statements:

> Unless you got those motherfuckers in the trunk of your car and you about to say Jay, I got these n[*****] I got them outside in the trunk. What you wanna do with em? Then you call me. Okay. If you call me and say Jay, I got I done went past the schools and scooped these n[*****] kids up. What you want me to wanna do with em? If you got the Mayor tied up with duct tape and a rope in the back of your SUV and say Jay I got this n[*****]. What you wanna do with it? Then you call me.

Finally, in Exhibit 31C, Johnson again made a similar statement:

> You wanna knock the shit out of somebody, knock the fuck out of them. You see 2/3 cops jumping on a motherfucker, jump on those motherfuckers." . . . "How you gonna go to jail when they unconscious", "Take the god damn body cameras off of em, take the motherfucking police car, flip that bitch over and set it on fire. Make your neighborhood a zone they can't come into."

## B.   OTHER VIOLENT STATEMENTS BY JOHNSON

During Johnson's trial, very limited excepts of posts to Johnson's social media were

admitted.  A publicly available messaged titled "**NFAC_MESSAGE_TO_MINNEAPOLIS**"

was posted to social media and was not introduced at trial:

> Around 00:50 – Johnson is making threats to specific law enforcement officers involved in the Minneapolis incident. "And that motherfucker who had his knee on his neck we coming for you. I'll say it publicly, them other ones the little fat one that stood around with his arms folded, we coming for you. We coming to see you. Oh, oh, oh, y'all didn't think it was gonna go this way, we coming for your city. Oh, we don't give a fuck about your gun laws."
> Around 01:15– Johnson explains how to join NFAC. "All you have to do is be suited and booted and packed and strapped and not afraid to bust."
> Around 02:38 – Johnson talks about Minneapolis contacting Georgia because NFAC was marched there and is making demands on what he wants Minneapolis

to do with the officers involved. "We ain't coming to march and we ain't coming to talking."

Around 05:05 – "Until we start putting a few of them in the grave and until we start sending they ass to the hospital until we start burning up they shit until we start doing shit to they women and children like they doing to ours they are not gonna back off of us."

Around 05:45 – "Bring all that shit you bought from the government, bring all that militarized shit that y'all got from the MRAT (?) program, bring all that shit and let's see who got some shit for real." "This aint got nothing to do with color. This right here got to do with people in authority abusing the people they have authority over. Now it's time for the people who don't have authority to hit yo ass back, knock you back a couple steps and make you think about it."

Around 10:59 – "like Malcom said be courteous and respectful but when they put they hands on you send they ass to the morgue or the hospital and right now the hospitals is full."

Around 12:00 – Johnson tells his viewers to "bring your shit, bring what you got" and "there's more of us then there are of them." He addresses law enforcement and says "if you really want to have the worst day in US history, if you really want to see what it's like, to all the shit you carry, what it's like when they know how to shoot back, if you really want it like that we'll bring it to you."

Around 13:25 – "I told you the next time we show up you was gonna hear us before you saw us."

Around 15:54 – "If you join NFAC and we find out you're working for the other side, *we will kill you*."

In another, publicly available video posted to social media titled

"NFAC_MESSAGE_TO_MINNEAPOLIS_PART_2" Johnson continued to deliver his message

inciting violence and threats.  A very small portion of the video was introduced at trial.

Johnson starts the video wearing a mask and talking about the anger inside of everyone.

Around 04:44 – Johnson says "we will react anyway we choose and see fit. We don't care about your laws, we don't care about anything you set up because it does not benefit us."

Around 07:25 – "I'm not afraid to tell y'all to tear this motherfucker up and I'll be right out there with you tearing shit up."

Around 09:40  – "Going forward you kill us we gonna kill you, point fucking blank. If we can't get to you, we'll go after your family members. If we can't get them, we're gonna go after your church members. If we can't get them, we're gonna go after your co-workers and if we can't get them, fuck it, we'll just go after anybody."

Around 12:05 – "I went to the gun store to make myself feel good. Picked up a couple more toys for myself. Picked up something cute that I could hand to a sista and say "shoot that motherfucker for me".

Around 15:45 – Johnson talks about how they showed up to Bryant's (?) house and how he hid in his car from the NFAC.

Around 16:48 – "We show up looking for some bodies to put in the ground."

Around 18:29 - "Unless you got those motherfuckers in the trunk of your car and you about to say Jay, I got these n[*****] I got them outside in the trunk. What you wanna do with em? Then you call me. Okay. If you call me and say Jay, I got I done went past the schools and scooped these n[*****] kids up. What you want me to wanna do with em? If you got the Mayor tied up with duck tape and a rope in the back of your SUV and say Jay I got this n[****]. What you wanna do with it? Then you call me."

Around 19:29 – Johnson tells people to stop being afraid of their own impulses. "You wanna knock the shit out of somebody, knock the fuck out of them. You see 2/3 cops jumping on a motherfucker, jump on those motherfuckers."

Around 19:55 – "How you gonna go to jail when they unconscious", "Take the god damn body cameras off of em, take the motherfucking police car, flip that bitch over and set it on fire. Make your neighborhood a zone they can't come into."

Around 20:24 – Johnson talks about a white woman who was going to call the police and how she needed her ass whipped. Johnson states he keeps a few "sistas on deck for jobs just like that."


During Johnson's July 25, 2020 video recorded speech from Metro Hall in Louisville,

Johnson again made violent statements against the city of Louisville and law enforcement.

Around 06:12 – "we'll burn this bitch [Louisville] to the ground."

Around 07:10 – "The kind of help that put people in the hospital, put people in the ground, like they been doing to us. Cause that seems to be the only language they understand."

Around 07:45 – "I've got thousands and thousands of guns and people willing to use them"

Around 08:25 – "My people will defend themselves if attacked. We will not shoot you we will kill you."

Around 18:05 – he talks about who he has with him – "the gangs, hitters, and bangers too."

Around 26:30 – Johnson tells the NFAC to check the roof and assume the position – "I don't know who the fuck you are but you're about to get shot".

Around 34:00 – "we're going to burn this motherfucker down [Louisville]."

Around 37:31 – Johnson is talking about giving the city 4 weeks. He responds by quoting Malcolm X "you either going to the hospital or the morgue, last time I checked the hospitals were full."

--Johnson points out snipers on the roof the of the grand jury building—refers to FBI, Homeland Security etc.

## C.  <u>JOHNSON'S HISTORY WITH FIREARMS</u>

Johnson had a history of pointing rifles as threats.  (See DN 27, United States Motion in Limine FRE 404(b)).  First, Johnson was arrested in El Paso, Texas, for hitting a woman several times and pointed a shotgun at four others to threaten and intimidate them. He was indicted for his actions and released but not before the prosecutor collected eyewitness statements and other evidence proving Johnson committed the crime.

Specifically, the FBI conducted a review of Johnson's criminal history which showed a pattern of Johnson making threatening statements and then using a rifle or long gun to further threaten various individuals, including women and his wife. An arrest record from the El Paso Police Department in Texas, on or around March 10, 1995, revealed Johnson was arrested for "Intentionally and knowingly cause [sic] bodily injury to Reisha Williams, by striking her on the left side of the face several times with a closed fist causing pain". Additionally, Johnson was arrested for "Intentionally and knowingly use [sic] a deadly weapon, to-wit: westerfield 20 gauge shotgun, manifestly designed, made and adapted for the purpose of inflicting death and serious bodily injury and did then and there threaten Jose Antonio Reyes with imminent bodily injury by the use of said deadly weapon." The same charge was applied to three other victims of Johnson's threating behavior with the shotgun, those individuals being: Cosme Rodriguez Navarro, Sererino Navarro, and Carlos Flores.

Review of court documents from the Judicial District Court, El Paso County, Texas reveal Johnson was indicted on March 28, 1995 on one count of "unlawful carrying of a weapon on premises licensed for alcoholic purposes". Johnson's attorney filed a motion to quash the indictment which was successful, and the indictment was dismissed on May 16, 1995. The

13

defense appears to have made a successful technical argument that only "handguns, clubs and illegal knives" were prohibited at premises licensed for consuming alcoholic beverages", and that the shotgun that Johnson used to threaten the five victims did not fit the "handguns, clubs and illegal knives" definition.

Additionally, Military Police detained Johnson in August 2003 after he drove onto the Fort Bragg Military base to kill his wife and her platoon sergeant. Johnson reached for a gun, but his wife ran away, and Military Police caught him. Police searched his car and found a gun and over 50 rounds of ammo.  In August 2003, a federal criminal complaint alleged that Johnson had an AR 15 rifle, similar to the rifle he possessed on September 4, 2020, and was threating to kill his wife and her platoon sergeant at Fort Bragg Military Reservation.  Johnson was charged with trespassing and threatening communications.  Johnson ultimately pleaded guilty to trespassing. See DN 27-2.

According to the affidavit filed by an FBI agent in the Fayetteville, North Carolina, the location of Fort Bragg,  Johnson threatened to kill his wife, Sheneice Johnson [Sheneice] and her Platoon Sergeant, while Sheneice's unit was having a formation and recognition ceremony on Fort Bragg.

According to the affidavit, Sheneice's unit had just returned from overseas duty in Kuwait on July 30, 2003. Sheneice had been having marital problems with Johnson and claimed to be a victim of mental and physical abuse in their marriage.  On August 1, 2003, after a formation, Sheneice approached Johnson, who had driven onto the reservation, and Johnson told her he was going to "kill your friend". After this statement, Johnson reached for a rifle in the trunk of his vehicle, and Sheneice tried to stop him but Johnson threatened to kill Sheneice if she didn't "get away". Sheneice ran away but Johnson followed her in his vehicle.

Military Police eventually intercepted Johnson and requested consent to search his vehicle. An AR-15 rifle was found in the trunk along with three rifle magazines and 56 rounds of 5.56 ammunition. Johnson was convicted on September 2, 2003, of one count of violating Title 18 United States Code, Section 1382 (Trespassing on a Federal Installation) and appears to have been sentenced to one month in jail and a $100.00 fine.

The FBI obtained Johnson's United States military record which revealed he was a single channel radio operator in the Virginia National Guard from April 27, 1989 until October 16, 1990. Johnson enlisted in the United States Army on or around October 17, 1990, again as a single channel radio operator.  According to Johnson's DD 214 - Certificate of Release or Discharge from Active Duty, he served active duty in the United States Army from October 17, 1990 until July 18, 1997. During this time period, he earned an "Expert Marksmanship Badge w/ Rifle Bar" and was honorably discharged.

According to Johnson's DD 214 -Certificate of Release or Discharge from Active Duty, he next served active duty in the United States Army from July 23, 1998, until September 22, 1999, after which time he was discharged "under other than honorable conditions" and demoted to the rank of "Private". Further review indicates Johnson accepted this discharge in lieu of trial by court martial.  Between the period of October 17, 1990 and September 22, 1999, Johnson's Military Occupational  Specialty (MOS) changed from radio operator to Personnel Sergeant, Finance NCO, and Admin NCO. These later MOS's are administrative and paperwork roles in the U.S. Military. A form in Johnson's service record, number DA 2166-8 Non-Commissioned Officer Evaluation  Report, exists for the period December 1, 2003 until November 31, 2004, indicating he had rejoined the U.S.  Military.  That form reveals Johnson's MOS was Personnel Service Sergeant, which is an administrative and paperwork role in the US Military. Review of

Johnson's military file does not indicate how he was able to reenlist after being discharged "under other than honorable conditions" in lieu of trial by court martial.

On March 18, 2005, Johnson was placed on AWOL status for lying about an appointment and being assigned to quarters. On March 21, 2005, Johnson was classified a Deserter/Absentee". At that time, his MOS was listed as Human Resources Specialist and a notation was made that he was under a pending Army Criminal Investigation Division (CID) investigation for fraudulent enlistment.

On March 1, 2006, Johnson was apprehended and returned to U.S.  Military custody where he was charged with being AWOL from March 18, 2005, until March 1, 2006. On March 9, 2006, Johnson's Army counsel requested "Discharge in Lieu of Trial by Court Martial". This request was approved on March 22, 2006 and Johnson was discharged for a second time "under other than honorable conditions". On March 24, 2006 Johnson was reduced in rank from Sergeant to Private.

While Johnson's claim is true that he did serve in the Army.  His service records, however, show his military performance was far less than stellar. Johnson received two other than honorable discharges from the military. Johnson even omitted his other than honorable discharges from his security clearance SF-86 form. On June 9, 2015, Johnson submitted his security clearance application Form SF-86 omitting any reference to military service and his two other than honorable military discharges.

### D.   SENTENCING GUIDELINES AND CRIMINAL HISTORY CATEGORY

The United States agrees with the guidelines contained in the PSR.  The United States agrees Johnson's cranial history category is zero. Johnson has a guideline range of 6 to 12 months plus a mandatory consecutive sentence of seven years.

E.    **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a).**

Based on the United States' calculations, Johnson's guideline range of 6 to 12 months

plus a mandatory sentence for 7 years (84 months) for brandishing a firearm in relation to a

crime of violence.  This Court must ultimately affix a sentence which is sufficient, but not

greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  For the

reasons that follow, the United States respectfully requests that the Court impose a sentence

within the applicable Guideline range.

Title 18, United States Code, section 3553(a) guides the Court regarding factors to

consider when imposing a sentence.  That section directs courts to consider the following:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner;
>           (3) the kinds of sentences available;
>           (4) the kinds of sentence and the sentencing range
> established for--
> (A) the applicable category of offense committed by the applicable
> category of defendant as set forth in the guidelines. . .
> (5) any pertinent policy statement--. . .
> (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

According to his own words, Johnson intentionally pointed a weapon at the roof top to

intimidate and scare what he believed to be kids on the roof top.  The proof introduced at trial

proved that Johnson knew where he was and knew police would be located on top of the

buildings in downtown Louisville.  Johnson even denied being the driver of the car he was obviously driving on September 4, 2020, in an attempt to sway the jury.  The individuals on the roof posed no threat to him and were lawfully in a position of overwatch to provide safety and security to the protestors exercising their first amendment rights in Jefferson Square Park below. Aiming a rifle at police without consequence, solidified Johnson's appearance of authority and power to his followers.

Johnson's intentional behavior to point his rifle to intimidate and show off for other NFAC recruits positioned near him on Armory Place, deserves significant punishment to deter individuals from using firearms as a tool for intimidation.  When Johnson pointed the firearm at police on the roof, his followers formed a human shield around him.  The video recording documenting the crime from multiple angles, shows his followers circling him in a protective barrier as he aimed his firearm at the police on the roof, illuminating them with this tactically mounted flashlight on the muzzle of his AR-15 rifle with a 30-roung magazine.  There is evidence that Johnson, who was trained to use an AR-15 in the military, pointed the rifle and then returned the firearm to safe.

According to his own words, Johnson did not feel threatened when he committed the crime and did it to scare and intimidate.  This behavior was extremely dangerous.  First, police could have fired at Johnson in self-defense.  Johnson could have been shot and killed.  Johnson's action could have caused his followers forming the human shield wall to get shot or killed. This community is fortunate that law enforcement did not escalate the situation at the time and the investigation was turned over to the FBI.  In addition, the immediate arrest of Johnson would have caused a potential armed conflict between police and Johnson's heavily armed followers. Had the situation escalated the result would have been to cause additional civil unrest in the

18

community.  As a result, there was no additional violence or loss of life that would have resulted from a gun fight in Downtown Louisville on September 4, 2020.

There appear to be many sides to Johnson, while he claims to have received awards for peace, there is the other side that advocated for violence with firearms and then culminated with his own illegal actions with firearms.  It is hard to accept that Johnson felt it was acceptable to just walk around downtown Louisville aiming an assault rifle at people surrounded by government buildings, residences, and businesses.  Our city is not a war zone and Johnson had no justification to proactively point the rifle at the task force officers.   It was Johnson's behavior that created the dangerous situation and he should be held accountable for his actions.  The sentence for Johnson should adequately reflect his conduct in that he used a military style assault weapon to clear a public street in downtown Louisville the night before the Kentucky derby.  He did it with the safety of the rifle off.  He did with a 30-round magazine in the chamber and a tactical flashlight on the end of the barrel.

Johnson was interviewed by the FBI.  For some reason, Johnson told them he was the only one with a flashlight.      Johnson was on notice of police presence, knew where he was, and consciously chose to aim a rifle to the top of the grand jury building.  He did it because Johnson wanted to demonstrate his ability to, without recourse, to brandish a weapon to scare, intimidate, and threaten police in front of his followers.  His intentional behavior caused a grave risk to task for officers, other police, and his followers who perceived no threat from the roof.  Johnson has no excuse for his behavior.  He was trained to use an AR-15 in the military.  He had been downtown to Louisville before.

The sentence imposed in this action should be substantial in order to adequately reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the

19

offenses, deter further criminal conduct, protect the public from further crimes of the defendant,

and provide Johnson with needed correctional treatment.

**F.  CONCLUSION AND RECOMMENDATION**

For the reasons set forth herein, the United States respectfully requests the Court to apply

the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C.

§ Section 3553(a), and impose a sentence of within the guideline range.


Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney


 s/Joshua Judd
Joshua Judd
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky  40202
PH:  (502) 582-5911

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2022, I electronically filed the foregoing with the
clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to
the counsel for defendants.

 s/Joshua Judd
Joshua Judd
Assistant U.S. Attorney