# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                    No. 3:21-cr-31-BJB

JOHN F. JOHNSON

* * * * *

## MEMORANDUM OPINION & ORDER

John F. Johnson, also known as "Grandmaster Jay," is the founder and leader of the Not Fucking Around Coalition, a self-styled African American militia organization. On September 4, 2020—the day before the Covid-delayed Kentucky Derby—Johnson and some NFAC members visited downtown Louisville. They did so in response to a media report that a march planned for the next day outside Churchill Downs had been cancelled. That evening, Johnson pointed his AR-15 (equipped with a tactical flashlight attachment) at the roof of a government building. Law enforcement officers were patrolling the downtown streets from that rooftop at the time.

Fortunately no shots were fired and no one was injured. But Johnson was arrested a few months later for brandishing a deadly or dangerous weapon, 18 U.S.C. § 924(c)(1)(A), to forcibly assault, resist, oppose, impede, intimidate, or interfere with an on-duty law enforcement officer, 18 U.S.C. § 111(b). Ultimately a jury convicted him of these offenses.

Johnson has filed motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29 (DN 90), a new trial under Rule 33 (DN 91), and release from custody pending sentencing under 18 U.S.C. §§ 3143(a) and 3145(c) (DN 94). He twice moved for a judgment of acquittal during the trial—first at the close of the government's evidence and then after the defense rested—on the ground that the evidence was insufficient to sustain a conviction. *See* Trial Tr. Vol. 4 (DN 79) at 102–03; Trial Tr. Vol. 5-A (DN 80) at 79–80. The Court reserved its ruling each time. Trial Tr. Vol. 4 at 104; Trial Tr. Vol. 5-A at 80.

Johnson's Rule 33 motion contends that a new trial is warranted for several reasons: the convictions went against the manifest weight of the evidence, § 111(b) is not categorically a crime of violence, the jury instructions were improper, and the Court seriously erred in its evidentiary determinations. And Johnson says he should be released from custody because his motions are likely to succeed.

1

Johnson's motions all miss the mark.   Because the government presented enough evidence for a rational jury to find Johnson guilty of these crimes beyond a reasonable doubt, the Court denies his motion for acquittal.  Nor do the interests of justice warrant a new trial under Rule 33.  And because Johnson fails to satisfy the statutory requirements for release from custody pending sentencing, the Court denies that motion as well.

## I.    Motion for Judgment of Acquittal

The "relevant question" on a Rule 29 sufficiency-of-the-evidence challenge "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ward*, 957 F.3d 691, 695 (6th Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S 307, 319 (1979)).  A court may not "weigh the evidence, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* at 696 (quotation omitted).  Johnson's burden is therefore "very heavy." *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004).

### A. The Statutes

Count 1 of the indictment charged Johnson with violating 18 U.S.C. § 111(b). Section 111 has been described as a "rather convoluted statute." *United States v. Gagnon,* 553 F.3d 1021, 1026 (6th Cir. 2009).  As the Sixth Circuit has explained, it:

> sets forth three separate crimes whose elements must all be submitted to a jury.  Two crimes are established in § 111(a): a misdemeanor (cases involving only simple assault) and a felony (all other cases). … A misdemeanor violation of § 111(a) occurs when a defendant forcibly commits *any* of the prohibited actions listed in § 111(a)(1) and § 111(a)(2), while "all other cases" covers the commission of these same violations *plus* the intent to commit a felony or resulting physical contact from forcible (and thus intentional) action.  The third crime—an aggravated felony—is committed by violating § 111(b), which prohibits violations of § 111 that either involve a deadly or dangerous weapon or result in bodily injury.

*United States v. Rafidi*, 829 F.3d 437, 445 (6th Cir. 2016) (internal quotations and citations omitted).[1]

---

[1] Congress amended § 111(a) by replacing "all other cases" with "where such acts involve physical contact with the victim of that assault or the intent to commit another felony." *See* Court Security Improvement Act of 2007, Pub. L. No. 110-177, § 208(b), 121 Stat. 2538.  This amended language is irrelevant for purposes of this decision.

The government accused Johnson of using "a deadly or dangerous weapon," not of an assault that "result[ed] in bodily injury." So to convict Johnson of the aggravated felony under § 111(b), it had to prove beyond a reasonable doubt that he used a deadly or dangerous weapon and "(1) forcibly (2) assaulted, resisted, opposed, impeded, intimidated, or interfered with (3) a federal officer (4) in the performance of his duties." *United States v. Milliron*, 984 F.3d 1188, 1194 (6th Cir. 2021) (quotation omitted).

Section 111 (whether charged as a felony or a misdemeanor) establishes a "general intent crime." *Milliron*, 984 F.3d at 1194–95. A "showing of bad purpose" is therefore not necessary; the mens rea element requires "only that a person knowingly, consciously, and voluntarily committed an act which the law makes a crime." *Id.* at 1194 (quotation omitted). "The element of force necessary for a conviction under § 111 may be shown by such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *Rafidi*, 829 F.3d at 446 (cleaned up). A defendant, moreover, needn't "be aware that his victim is a federal officer." *United States v. Feola*, 420 U.S. 671, 684 (1975). But "an honest mistake of fact regarding a victim's official status can negate the criminal intent required by section 111 where the assault would be justified if the victim were not an official," such as in a situation justifying self-defense. *United States v. Plummer*, 789 F.2d 435, 438 (6th Cir. 1986).

The government also charged Johnson with violating 18 U.S.C. § 924(c). That provision imposes a series of mandatory minimum criminal sentences on anyone who "during and in relation to any crime of violence … uses or carries a firearm." § 924(c). A "crime of violence" is a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3). Using or carrying a gun during and related to a crime of violence carries a 5-year minimum sentence. § 924(c)(1)(A)(i). But "if the firearm is brandished," the statute requires the defendant to "be sentenced to a term of imprisonment of not less than 7 years." § 924(c)(1)(A)(ii). Discharging the firearm increases the minimum term to 10 years. § 924(c)(1)(A)(iii). Count 2 of the government's case against Johnson charged him with brandishing a firearm while violating § 111(b).

## B. The Evidence

Johnson principally contends that he couldn't have committed these crimes because he "did not possess an intent to assault anyone." Motion for Acquittal at 10. Rather, he merely intended to lead a peaceful march. *Id.* at 6–10. The officers, moreover, didn't perceive any intentional threat or attempt to injure. *Id.* at 15. Citing largely his own testimony, Johnson contends that "substantial evidence supports that [he] did not intend to assault anyone, let alone a federal officer, and that no

intentional threat or attempt to cause serious bodily injury was perceived by the officers." *Id.* at 15.

Insofar as Johnson contends the government lacked evidence of specific intent, that argument fails. As noted above, §§ 111(a) and (b) are general-intent crimes. *See Milliron*, 984 F.3d at 1194–95.

Insofar as he asks the Court to reweigh the evidence or question the credibility of the government's witnesses, the request again fails. The Court can't engage in those tasks—which the law assigns to the jury—on a motion for judgment of acquittal. *See Ward*, 957 F.3d at 696.

And insofar as Johnson maintains the government's evidence was simply insufficient to persuade a rational jury, that reasoning likewise fails. The government presented more than enough evidence at trial to convict Johnson under Count 1 for forcibly "assaulting, resisting, or impeding" an officer performing his official duties while using a dangerous or deadly weapon. Indictment (DN 13) at 1.

That evidence consisted of testimony from the officers on the rooftop, video recording of the night in question, Johnson's own words on the witness stand and in previous recorded statements, and testimony from others regarding Johnson's knowledge that officers had been or would be stationed on downtown rooftops. As presented to the jury, this proof supported the government's position that Johnson pointed his AR-15 at officers stationed on the roof of the grand-jury building in downtown Louisville, and that the officers felt threatened and fearful as a result.

Johnson and other NFAC members drove to downtown Louisville on September 4, 2020, the day before a planned march outside Churchill Downs. Motion for Acquittal at 10–11; Response to Motion for Acquittal (DN 95) at 2–3. Johnson armed himself with an AR-15 and tactical flashlight attachment. Trial Tr. Vol. 3-A (DN 78) at 48; Trial Tr. Vol 3-B (DN 73) at 131. Given the ongoing local protests over policing practices in Louisville and elsewhere, armed Louisville Metro Police Department and federal officers were positioned on downtown rooftops to provide surveillance. Trial Tr. Vol 3-A at 5–6, 98.

Video footage showed Johnson pointing an AR-15 (and mounted flashlight) at the rooftop of the state-court "Grand Jury Building," which is housed in an old jail. *See id.* at 35, 56; Exhibit 8-B. And multiple officers testified that Johnson moved his hand and fingers while the gun was raised in a manner consistent with manipulating the gun's selector switch (commonly known as the safety); this, they said, would've enabled Johnson to fire the gun as he pointed the barrel and flashlight toward the roof. *See* Trial Tr. Vol. 3-A at 48–49, 55–56; Trial Tr. Vol. 3-B at 99–100, 140. Although the officers could not see Johnson's fingers from the roof at the time, both

sides addressed his hand movements, as shown by the videotape, as evidence of his intent.

As to the effect this had, multiple law enforcement officers present on the rooftop described how this caused them to feel threatened and fearful for their safety.

That night Sergeant Tim Nett was stationed on the rooftop of the Grand Jury Building. Trial Tr. Vol. 3-A at 35. After learning that a group of armed individuals had congregated on the street below, Nett walked to the edge of the rooftop. *Id.* at 26–31. When he leaned over, he "immediately g[ot] the light" from Johnson's mounted flashlight "directly in [his] face." *Id.* at 31. This caused him "great alarm." *Id.* "I was shocked. I was fearful." *Id.* at 57. Nett responded by "stay[ing] back from the edge more to give [himself] some cover," because "when you have a rifle pointed at your head, you kind of change what you're doing." *Id.* at 45.

Scott Claxon, an FBI task force officer, was also on the roof that night. Claxon testified that he saw "a rifle swing and … a flashlight blind me." Trial Tr. Vol. 3-B (DN 73) at 131. And because Claxon knew he was "within the effective area of that rifle," he "pulled back trying to get a little bit of cover." *Id.* at 131–32.

Detective John Daniel, posted near Nett and Claxon, testified that he perceived the rifle pointed at him to be a "threat." *Id.* at 95.

This evidence alone satisfied the elements of § 111(b), including general intent on Johnson's part. No evidence suggested he involuntarily or unconsciously pointed the gun. As the Sixth Circuit has concluded in related circumstances, "it was reasonable for the jury to conclude that [the defendant's] act of placing his hand in his pocket (that contained a semi-automatic pistol) was a forcible assault or 'a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.'" *United States v. Chambers*, 195 F.3d 274, 277 (6th Cir. 1999). Here Johnson didn't place his hand on a pocketed weapon—he pointed the weapon at the officers. The jury concluded that his action satisfied the elements of § 111(b).

None of Johnson's alternate explanations prove the jury's verdict was irrational.

**1. Flashlight.** Johnson, citing his own testimony, contends that the "evidence clearly show[ed]" that he never "aimed at any particular individual," but rather just "'shin[ed] it like a flashlight.'" Motion for Acquittal at 14 (quoting Trial Tr. Vol. 4 (DN 279) at 236). That is certainly a plausible interpretation of the video evidence and in-court testimony—a point that Johnson's skilled trial counsel repeatedly made. And Johnson's own extensive and eloquent testimony squarely presented the jury with evidence that he did not act in a threatening manner. But that is not the *only* plausible interpretation of these events. The testimonial and photographic evidence discussed regarding the gun's safety, for example, ran contrary to Johnson's assertion

that he merely used the gun as a flashlight. And "[t]he fact that the jury did not draw the desired inference from [the defendant's] account of the evidence does not render his conviction invalid for want of sufficient evidence." *See United States v. Threadgill*, 572 F. App'x 372, 381 (6th Cir. 2014). The jury was not required to believe Johnson's testimony over that of the government's witnesses, and the Court may not second-guess the jury's findings based on that evidence.

   **2. Lack of knowledge.** Finally, Johnson contends he didn't know officers were on the roof of the grand-jury building. Even if "he did not know that the victim was a federal officer," Motion for Acquittal at 16, however, that would not invalidate his conviction, *see Feola*, 420 U.S. at 686. Johnson cites evidence that he didn't know officers would be downtown because the planned march was at Churchill Downs, because he was an out-of-towner who didn't know Louisville well, and because his vision was obscured by darkness and prescription sunglasses. Motion for Acquittal at 11, 16–19. Again, this all reflects evidence that Johnson and his lawyer skillfully, if unsuccessfully, put before the jury during the proof and argument phases of the trial.

   Johnson doesn't appear to argue, moreover, that the government failed to present *any* evidence that Johnson knew officers (rather than private citizens) stood on the roof. LMPD Major Aubrey Gregory testified that he told Johnson that officers would be stationed on downtown roofs during NFAC's first visit in July, and on the roof of Churchill Downs during the September march. Gregory told Johnson in July that "there would be sniper teams" on the "roofs of the civic buildings around Jefferson Square Park," near the Grand Jury Building. Trial Tr. Vol. 2 (DN 77) at 60. And during that visit, when Johnson spoke on the front steps of City Hall, he faced the Grand Jury Building and (among many other remarks) "thank[ed] all these snipers" who "wear the uniform you all hate." Exhibit 4-C ("They are protecting us. We have everybody out here today you all. We have the Department of Homeland Security ... the FBI ... even ... the IRS out here."). He pointed at officers on the roof and instructed nearby NFAC members to "assume the position." Trial Tr. Vol. 3-B at 34–35. While Johnson challenges this testimony by pointing to other trial testimony calling into question whether these remarks and actions were actually directed toward the grand-jury building, the Court may not make credibility determinations on a Rule 29 motion. And even if it could, these are the sort of "contested facts that we generally task juries with resolving." *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020).

   In September, officers again warned Johnson about officers stationed on roofs in Louisville. *See* Trial Tr. Vol. 2 at 117–19 (Churchill Downs). Although Johnson contests the photographic reproductions of the scene, the government also showed exhibits portraying what Johnson may have been able to see on the roof from his position in the street. Exhibits 14 A–D. To be sure, Johnson argued at trial that the

government's before- and after-the-fact evidence couldn't establish his knowledge as of September 4. But the jury rejected that position. Even "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020) (quotation omitted). Here direct and circumstantial evidence alike supported a finding that Johnson knew people were on the roof when and where he pointed his rifle. The government therefore presented evidence that supported each element required to convict Johnson under § 111(b). So the Court denies Johnson's motion with respect to Count 1.

**3. Self-defense.** Johnson also argues that "the evidence strongly supports" the notion that "he acted only on a reasonable good-faith belief that self-defense was necessary to protect against an assault by a private citizen…." Motion for Acquittal at 16. He testified that he constantly received death threats, thought a dangerous civilian might've been atop the grand-jury building, and reacted defensively in response to that apparent threat. *Id.* at 16–19. He also cited a story—both in his statement to officers before his arrest and again at trial—that he was acting in self-defense to what he purportedly thought were civilians with paintball guns. *See* Exhibit 29-E.

The extensive evidence and testimony discussed above regarding Johnson's knowledge of officers on Louisville rooftops goes far to undermine this account of the proof. But even if the evidence *did* "strongly suppor[t]" his version of the events, it wouldn't be enough to grant Johnson's Rule 29 motion. The standard is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ward*, 957 F.3d at 696 (quoting *Jackson*, 443 U.S at 319).

## C. § 924(c) conviction

Johnson also attacks his conviction for brandishing a firearm "during and in relation to" a "crime of violence" in violation of § 924(c)(1)(A). *See* Motion for Acquittal at 19. Section 111(b) is a predicate "crime of violence" for purposes of § 924(c)(1)(A). *See Rafidi*, 829 F.3d at 443–44.[2] Johnson's only argument for acquittal of his § 924(c)(1)(A) conviction is that "no rational jury could have found [him] guilty of Count 1 beyond a reasonable doubt." Motion for Acquittal at 19. Because the Court sustained the jury's verdict on Count 1, acquittal of Count 2 is unwarranted.

## II.    Motion for a New Trial

A district court may "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Rule 33 permits a new trial if the jury's

---

[2] Johnson contests this conclusion in his motion for a new trial, but not in his motion for acquittal. The Court therefore addresses his argument below in Section II.B.

verdict went against the "manifest weight of the evidence," or "where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 374 (6th Cir. 2010) (quotation omitted).

A "trial judge faced with [a Rule 33] motion must take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *United States v. Matthews*, 31 F.4th 436, 448 (6th Cir. 2022) (quotation omitted). Still, a court should order a new trial "[o]nly in extraordinary circumstances, when the verdict exceeds the bounds of reasonableness." *Burks*, 974 F.3d at 625 (quotation and citation omitted). The *only* decision this Court is aware of in which the Sixth Circuit "affirmed the grant of a new trial based on the weight of the evidence" was an unpublished decision which "turned on 'numerous discrepancies' in a key witness's testimony and 'the lack of corroborating testimony or evidence.'" *Id.* at 627 (collecting cases) (quoting *United States v. Lewis*, 521 F. App'x 530, 541 (6th Cir. 2013)). This lopsided scoreboard reflects (among other things) that a "verdict is not unreasonable simply because different inferences could have been drawn or because other results are more reasonable." *Id.* (quotation and alteration omitted). Rather, a new trial is warranted "if the evidence weighs 'heavily against the verdict.'" *Id.* (quoting *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019)).

Johnson asserts that a new trial is warranted on five different grounds, none of which succeeds.

## A. Manifest Weight of the Evidence

Johnson's Rule 33 motion, which "incorporates by reference" his Rule 29 motion, asserts that the evidence at trial "preponderates sufficiently heavily against the guilty verdict" on each count. Motion for New Trial at 3–4. This argument fails for largely the same reasons his sufficiency of the evidence argument failed above. Even though a judge confronting a Rule 33 motion may weigh credibility and evidence in a manner that would be inappropriate under Rule 29, *see United States v. Mallory*, 902 F.3d 584, 596–97 (6th Cir. 2018), the Court lacks any basis to disagree with the jury's consideration of the evidence here.

Contrary to Johnson's position, the evidence presented at trial did not weigh "heavily" against the verdict. Motion for New Trial at 3–4. The exhibits and witness testimony, discussed above, supported each element of both offenses of conviction. Unlike the solitary case described in *Burks*, this is not a trial in which numerous discrepancies in witness testimony or a lack of corroboration infected the verdict. 974 F.3d at 627 (describing *Lewis*, 521 F. App'x at 541). By contrast, the government put on multiple credible witnesses who testified consistently regarding how Johnson pointed a high-powered rifle at them, causing them to fear bodily harm. And the evidence supporting Johnson's theory—that he was just using his gun as a flashlight

in a non-threatening manner near people he thought were civilians—did not render the jury's contrary decision "unreasonable." *Id.* at 625 (quotation omitted).

Despite the strength of Johnson's presentation, as discussed above, this verdict was not the sort of "extraordinary circumstanc[e]" for which a new trial is necessary. So the Court will "respect the role of the jury and ensure that [these] evidence-supported convictions are upheld." *Id.* (district court abused its discretion in granting a new trial "based on contested facts that we generally task juries with resolving").

## B. Crime of Violence

Johnson next argues that his conviction under § 111(b) is not a predicate "crime of violence" necessary to convict him under § 924(c). As discussed above, § 924(c)(1) imposes a mandatory sentence for using, carrying, or (as the jury found here) brandishing a firearm "during and in relation to any crime of violence." The statute defines a "crime of violence" as a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3); *see United States v. Davis*, 139 S. Ct. 2319, 2324 (2019).

The Sixth Circuit has squarely held that an offense under § 111(b) is a crime of violence: "We conclude that a violation of § 111(b) … constitutes a 'crime of violence' under § 924(c)." *Rafidi*, 829 F.3d at 443–44. Johnson acknowledges as much, but takes issue with *Rafidi*'s reasoning.[3] *See* Motion for New Trial at 5. The Court is of course bound by Sixth Circuit precedent, so even if the Court agreed with Johnson that "*Rafidi*'s reasoning is highly problematic," *id.*, that wouldn't support a decision to vacate the jury's verdict. *See Panetti v. Quarterman*, 551 U.S. 930, 961 (2007) ("The District Court, of course, was bound by Circuit precedent …."). Johnson may preserve his objection to *Rafidi*'s implications on appeal, but this Court may not stray from binding Sixth Circuit caselaw.

---

[3] While not entirely clear, Johnson's motion appears to argue that *Rafidi* holds that § 111(b) constitutes a crime of violence only if the jury specifically found that the defendant forcibly "assault[ed]" an officer, as opposed to forcibly resisting, opposing, impeding, intimidating, or interfering with an officer. Motion for New Trial at 8–9. *Rafidi* was decided in the context of the lower court's decision to instruct the jury that it had to find "forcible assault," while deciding not to list the other acts provided in § 111(a)(1), such as resist, oppose, or impede. *Rafidi*, 829 F.3d at 446. That *Rafidi* involved only "forcible assault" does not change its unqualified holding that "a violation of § 111(b)" "constitutes a 'crime of violence' under § 924(c)." *Rafidi*, 829 F.3d at 443–44. Johnson's other attempts to evade this conclusion by quoting *Rafidi* out of context or citing out-of-circuit caselaw are likewise unpersuasive.

## C. Unanimity Instruction

Related to Johnson's crime-of-violence challenge is his assertion that the Court mistakenly declined to give a "unanimity" instruction, which deprived him of a fair trial and his "constitutional rights to due process." Motion for New Trial at 9–11. He says that the government presented evidence that Johnson violated "more than one of the listed modalities" under § 111, such as assaulting, impeding, intimidating, and interfering with an officer. *Id.* The Court, Johnson contends, therefore should have given the jury a special verdict form and instructed that "it could convict Mr. Johnson only if the jurors were unanimous on which type of conduct occurred." *Id.*[4]

"A specific unanimity instruction is ordinarily unnecessary unless: '(1) a count is extremely complex; (2) there is variance between the indictment and the proof at trial, or (3) there is a tangible risk of jury confusion.'" *United States v. Kimes*, 246 F.3d 800, 810 (6th Cir. 2001) (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992)). "A defendant charged with violating § 111 is not entitled to a specific unanimity instruction unless the defendant's conduct constituted 'two separate and distinct offenses,' not merely 'two phases of a single assault.'" *Id.* (quoting *United States v. Hood*, 210 F.3d 660, 663 (6th Cir. 2000)).

The jury did not convict Johnson for committing "two separate and distinct offenses" under § 111(b), as Johnson implies. The Sixth Circuit rejected a similar argument in *Kimes*, 246 F.3d at 810 (upholding conviction under § 111(a) despite similar unanimity challenge), and in *Hood*, 210 F.3d at 663 (similar with respect to § 111(b)). Critically, the six verbs set forth in § 111(a) do not create six different crimes. *See United States v. Gagnon*, 553 F.3d 1021, 1023–24 (6th Cir. 2009) (§ 111(a)(1) establishes a single crime). And the charges here, of course, stemmed out of a single incident: Johnson pointing his AR-15 at officers on September 4. Johnson doesn't suggest that the jury somehow conflated two separate actions into a single conviction. The lack of "separate and distinct offenses" means Johnson, like other § 111 defendants, was "not entitled to a specific unanimity instruction." *Kimes*, 246 F.3d at 810 (quoting *Hood*, 210 F.3d at 663).

Count 1 of the indictment, moreover, is not the sort of "extremely complex" count that might lend itself to a unanimity instruction. As explained above, a

---

[4] Johnson's motion asserts that "defense counsel unequivocally raised this issue." Motion for New Trial at 11. This is incorrect, or at the very least overstated. Defense counsel never expressly requested a unanimity instruction, certainly not with respect to Count 1. He did discuss concerns regarding a potential "mixed verdict," but did so while pressing the Court to include the words "forcibly assaulted" into the instruction specific to Count 2—an objection the Court denied and Johnson doesn't challenge here. Trial Tr. Vol. 4 at 245. Regardless of whether the objection was preserved, this aspect of the Rule 33 motion would fail for the substantive reasons discussed above the line.

conviction under § 111(b) requires only that the defendant used a deadly or dangerous weapon to (1) forcibly (2) assault, resist, oppose, impede, intimidate, or interfere with (3) a federal officer (4) in the performance of his duties. *Rafidi*, 829 F.3d at 445. These basic elements were set forth in the jury instructions. *See* Jury Instructions (DN 55) at 4. Nothing about these elements is particularly complex compared to the mine run of criminal statutes, many of which may be violated in several different ways. Special verdict forms, after all, generally "are not favored and may in fact be more productive of confusion than clarity." *Kimes*, 246 F.3d at 810 (quotation omitted). Much less has Johnson shown that *not* giving such an instruction was error.

Finally, no "variance" necessitated a new trial. A "variance occurs if the evidence proves facts materially different from those alleged in the indictment." *Matthews*, 31 F.4th at 455 (quotation omitted). To get a new trial, a defendant must prove that the "variance affected the defendant's substantial rights." *Id.* (quotations omitted). That degree of prejudice requires, "for example, [that] the variance deprived the defendant of notice of the government's factual theory, prevented her from adequately preparing her defense, or could expose her to the risk of future prosecutions based upon the same conduct." *Id.* (quotation omitted).

The "variance" Johnson says warrants a new trial is the omission of the words "forcibly assaulted" from the "to wit" clause in Count 1 of the indictment. Motion for New Trial at 10. Count 1 of the indictment states:

> On or about September 4, 2020, in the Western District of Kentucky, Jefferson County, Kentucky, JOHN F. JOHNSON, a/k/a Grand Master Jay, the defendant, *forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with* any person designated as an officer and employee of the United States or any agency in any branch of the United States Government, in Title 18, United States Code, Section 1114, while engaged in and on account of the performance of official duties, and used a deadly and dangerous weapon in the commission, to wit: JOHN F. JOHNSON, a/k/a Grand Master Jay *resisted, opposed, impeded, intimidated, and interfered with* a Task Force Officer of the FBI by pointing an AR style rifle at the officer.
>
> All in violation of Title 18, United States Code, Sections 111(b) and 1114.

Indictment (DN 13) (emphasis added).

Johnson says this "variance" between the "to wit" clause and the body of the indictment left him[5] wondering "what, precisely, is [he] charged with? Could he be found guilty under Count 1 by proof of any of the six methods enumerated in the first half of Count 1; or, in the alternative, by proof of the five methods as the more specific allegations after 'to wit' alleges?" Motion for New Trial at 10–11.

Johnson's argument that he lacked notice doesn't come close to proving prejudice.[6] He was on notice before and during trial of what the government intended to prove. The body of the indictment expressly included the words "forcibly assaulted." The jury instructions (circulated in draft form early in the trial) tracked this language. Trial Tr. Vol. 2 at 48. And the government's evidence, outlined above, did not vary materially from the facts alleged in the indictment. So the mere omission of "forcibly assault" after "to wit" is not enough for a new trial. *See, e.g.*, *United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013) (no prejudicial variance because, considering the indictment "as a whole, the 'to wit' clause is properly understood to be illustrative rather than definitional of the core of criminality charged by the grand jury").

## D. Recreated Scene Photographs and Jury's Extrinsic Knowledge

The government introduced at trial post-incident photographs to "generally recreate the scene" from Johnson's vantage point on September 4. *See* Trial Tr. Vol. 4 at 12; Exhibits 14-A–D. FBI Agent Andrew Phillips photographed officers (the same ones at whom Johnson pointed his AR-15) standing on the roof of the Grand Jury Building on September 18, 2020, two weeks after the incident took place. Trial Tr. Vol. 4 at 12–14. Phillips testified that the officers, to the best of their memory, wore the same gear and stood in the same place as on September 4. *Id.* at 13–14. Phillips took the photos from approximately where Johnson stood on the street when he raised his gun, and at a time that was intended to produce similar lighting conditions to that which existed when the offense occurred. *Id.* at 14–16.

Johnson, citing Federal Rule of Evidence 403, argues that he did not receive a fair trial because the "unfair prejudice" caused by the photographs substantially

---

[5] Or perhaps the jury? The motion is unclear. The indictment couldn't possibly have confused the jury, however, because the Court (after related discussion and without objection) didn't send the indictment back with the exhibits and instructions during jury deliberations. *Cf.* Trial Tr. Vol. 5-A at 69.

[6] Johnson concedes that he didn't object on this ground at trial. *See* Reply (DN 101) at 4. That means plain-error review applies under Federal Rule of Criminal Procedure 52(b). *See United States v. McDougal*, 368 F. App'x 648, 651 (6th Cir. 2010); *United States v. Hale-Cusanelli*, No. 1:21-cr-37, 2022 WL 4300000, at *3 (D.D.C. Sept. 19, 2022).

outweighed their probative value.[7]   *See* Motion for New Trial at 12.   He takes particular issue with the photographs' lighting and the conditions under which they were taken.   Johnson's internet search revealed that while it was either "mostly cloudy" or "partly cloudy" on September 4, the weather was "fair" on September 18. *Id.* at 14.   "Thus, in no way could the recreated scene photo accurately reflect the visibility at the dark night of September 4, 2020."   *Id.* at 15.

Any prejudice caused by the photographs did not substantially outweigh their probative value.   They helped the jury visualize the roof of the Grand Jury Building from Johnson's approximate vantage point.   The photos were relevant insofar as they made more probable the fact that Johnson knew there were officers stationed on the Grand Jury Building when he pointed his gun towards the roof.   This tended to negate Johnson's assertion at trial that he didn't know there were officers on the roof and was only acting in self-defense.   *See, e.g.*, Trial Tr. Vol. 5-B (DN 74) at 48–50 (making these assertions during closing argument).

To the extent the photographs were at all prejudicial, the prejudice was mitigated when Johnson's trial attorney effectively cross-examined Phillips on whether the photographs accurately reflected the atmospheric conditions on September 4.   *See* Trial Tr. Vol. 4 at 84–85; *Woods v. Beavers*, 922 F.2d 842, 842 (6th Cir. 1991) (unpublished table decision) ("Any risk of unfair prejudice was mitigated by this opportunity to cross-examine.").   That cross-examination was effective—so effective that Johnson quoted a portion of it in his motion.   *See* Motion for New Trial at 14.   The jury also watched video footage of Johnson raising his gun at the officers. *See* Exhibit 8-B.   So the jury saw what the visual conditions were like that night and could compare them to the conditions in the recreated scene photographs.   The defense was able to raise this issue with the jury, which in turn was fully capable of making an informed determination with respect to Phillips's credibility and the relative weight this particular evidence should have been afforded.

Johnson also argues that the photographs' prejudicial effect increased because the inapt lighting conditions were "coupled with the jury's extrinsic knowledge of the constant police presence on the roof of the Grand Jury Building and their familiarity with the geographic layout of downtown Louisville."   Motion for New Trial at 12.   This contention is hard to follow.   The jurors had this prejudicial extrinsic knowledge, Johnson asserts, because they "naturally know, as part of their life experience, that police are constantly stationed on roofs of downtown buildings."   *Id.* at 16.

---

[7] Johnson never objected to the admission of the photographs at trial.   *See* Trial Tr. Vol. 3-B at 55 (Exhibit 14-A), 56 (Exhibit 14-C); Trial Tr. Vol. 4 at 17 (Exhibit 14-B), 20 (Exhibit 14-D).   So plain-error review applies.   *See McDougal*, 368 F. App'x at 651; *Hale-Cusanelli*, 2022 WL 4300000, at *3.   Regardless, Johnson's challenge would fail under any standard of review.

Why would familiarity with the scene of an alleged crime inherently prejudice jurors against a defendant accused of committing an offense there?  Johnson offers nothing to support the propositions that Louisvillians (but not Johnson) knew that cops were atop downtown rooftops and that this inevitably tainted their consideration of the evidence of Johnson's mental state.  Certainly the motion cites no law or evidence to that effect.  Even assuming Louisvillians knew "as part of their life experience" where officers were "constantly stationed," the Louisville Division of the Western District of Kentucky includes jurors who live far away from Louisville.  *See* Local Crim. R. 18.1(b) (11 Kentucky counties comprise the Louisville jury division). And while Johnson is correct that a jury must be "impartial," *see* U.S. CONST. amend VI, he doesn't grapple with the "well-established presumption of juror impartiality, as well as the equally important presumption that jurors followed the trial court's instructions," *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citation omitted).  The Court instructed the jury to base its decision "on the evidence that you saw and heard here in the court."  Jury Instructions at 1.  And those instructions focused the jury on *Johnson's* mental state and knowledge, not the jury's.  *Id.* at 4. Nothing suggests that the jury did otherwise or even possessed "extrinsic knowledge" that somehow prejudiced Johnson.  So this contention fails.

### E. Videos of Johnson's Past Statements

Johnson argues that the Court erred in granting in part the government's motion in limine to introduce portions of two different videos: (1) Johnson's July 2020 speech at Louisville's City Hall and (2) the statements by Johnson in May 2020 about law enforcement that he uploaded to YouTube following the death of George Floyd in Minneapolis.  Motion for New Trial at 17–19.[8]

The video of Johnson's speech appeared to show him acknowledging that officers stood on the roofs of the surrounding buildings.  Response to Motion for New Trial at 22 (citing Exhibit 4-C).  For example, Johnson said: "Check the roof, 2 O'clock, assume the position, now, 2 O'clock, I don't know who the fuck you are but you are about to get shot."  *Id.* (quoting Exhibit 4-B).  The YouTube video showed Johnson appear to threaten or advocate for violence against the police.  *See, e.g.*, Trial Tr. Vol. 2 at 24; Response to Motion for Acquittal at 11 ("You see 2 [or] 3 cops jumping on a motherfucker, jump on those motherfuckers.") (quoting Exhibit 31-C); *id.* ("Going forward you kill us we gonna kill you, point fucking blank.") (quoting Exhibit 31-A). Johnson contends that these video clips were inadmissible character evidence that had "zero probative value of any material issue in this case," and that "any probative

---

[8] During the pretrial conference in which the Court granted the motion in limine to admit this video evidence, the Court simultaneously agreed with Johnson's request to bar evidence concerning prior arrests related to a domestic dispute and trespassing on a military base. *See* DN 34.

value … is substantially outweighed" by its prejudice to Johnson.  Motion for New Trial at 18–19.

Federal Rule of Evidence 404(b) states that "[e]vidence of any other crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." It may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b).

"Before the court may admit 404(b) evidence, it must: (1) determine whether [there] is sufficient evidence that the prior acts occurred; (2) determine whether the other act is admissible for one of the proper purposes outlined in the rule; and (3) apply Rule 403 balancing ...." *United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011).  A "proper purpose" means evidence "probative of a material issue other than character." *United States v. LaVictor*, 848 F.3d 428, 445 (6th Cir. 2017) (quotation omitted).  This requires that "(1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Id.* at 446 (quotation omitted).

As the Court ruled at the pre-trial hearing, the video clips were admissible under Rule 404(b).  *See* DN 34.  Johnson doesn't dispute that he actually made the statements.  And the government offered the clips for an admissible purpose— several, actually.  They tended to prove the disputed issues of Johnson's motive, intent, knowledge, and absence of mistake or accident.

As his post-trial motions illustrate, Johnson's defense focused heavily on the contentions that he didn't intend to assault the rooftop officers, whom he didn't even know were present when he raised his AR-15.  *See* Motion for Acquittal at 10–15. Johnson's July 25 reference to people on top of downtown buildings, however, made more probable his knowledge of officers atop nearby roofs on September 4.  This in turn made it more probable that he knew officers were stationed on the roof of the Grand Jury Building when he pointed his AR-15 in that direction, undercutting his testimony to the contrary.

With respect to his comments on YouTube, Johnson's statements threatening to physically harm police officers went to his motive and intent to assault or interfere with the officers by pointing his AR-15 at them.  A defendant's mental state is very often contested, as it was here.  Yet it is rare to prove that essential element through direct rather than circumstantial evidence.  *See United States v. Bates*, 784 F. App'x 312, 326 (6th Cir. 2019).  That is how the government used this video here: it tended to negate Johnson's arguments that he unintentionally pointed the gun at the officers, just used it as a flashlight, and only acted in self-defense to civilians running around on the top of government buildings.  *See* Motion for Acquittal at 18 (arguing

that "[e]vidence is also substantial to show that Mr. Johnson acted only on a reasonable good-faith belief that self-defense was necessary to protect against an assault by a private citizen."). That the government didn't have to prove Johnson specifically intended to commit the crime makes little difference: "Rule 404(b) evidence is admissible to prove motive even in general intent crimes." *United States v. Walker*, 4 F.3d 995, 995 (6th Cir. 1993) (unpublished table decision).

The defense's theory of the case—that he didn't intend to point his gun at officers, but was using it as a flashlight in self-defense to unknown civilians—put motive, intent, knowledge, and absence of mistake or accident in issue. The defense contends Johnson didn't know officers were positioned on the roof. Because the videos were admitted to rebut this argument and were probative of material facts, their admission was not in error.

Finally, the videos of Johnson's statements survived Rule 403 balancing because their probative value was not substantially outweighed by the risk of unfair prejudice. Johnson says that the videos' unfair prejudice overcame the probity just discussed because "the Government took the video clips out of context." Motion for a New Trial at 19. But Johnson was of course free to argue as much to the jury—or to present the entire videos in full. Or to request a limiting instruction before or after the jury saw the videos. In any event, to the extent Johnson suffered any prejudice from the clips, it did not outweigh—let alone substantially outweigh—their probative value. The Court therefore denies Johnson's motion for a new trial.

### III.   Release from Custody Pending Sentencing

Johnson also moved for release from custody pending his sentencing. Congress instructed that a judge "*shall* order that a person who has been found guilty of an offense in a [relevant] case" be detained pending sentencing unless there is either "a substantial likelihood that a motion for acquittal or new trial will be granted" or the government "has recommended that no sentence of imprisonment be imposed on the person." 18 U.S.C. § 3143(a)(2) (emphasis added). If one of those two criteria is met, release still isn't proper unless evidence that the defendant is not likely to flee or pose a danger to society is clear and convincing. *Id.*

One of the types of offenses described in § 3142(f)(1)(A) is "a crime of violence." As discussed above, the jury convicted Johnson under § 111(b), a crime of violence. *See Rafidi*, 829 F.3d at 445–46. And Johnson doesn't satisfy the statutory requirements under § 3143(a) because his motions for acquittal and a new trial fall short, and because the government is recommending a term of imprisonment. *See* Response to Motion for Release (DN 100) at 2.

Johnson also argues that "exceptional reasons" warrant his release. Motion for Release at 7–11. "A defendant subject to detention under § 3143(a)(2) may be

16

released if it is 'clearly shown,' among other things, that there are 'exceptional reasons' why his detention is inappropriate." *United States v. Christman*, 596 F.3d 870, 870 (6th Cir. 2010) (quoting § 3145(c)).

The Court is unaware of any exceptional reasons that support Johnson's release before his upcoming sentencing hearing.  That Johnson plans to appeal and challenge the law of the circuit that an offense under § 111(b) is a crime of violence is not, contrary to his words, "a most unusual factual and legal situation" requiring release.  Motion for Release at 10.  Johnson argues that his crime was not "of a truly violent nature" and that "there are clear and convincing evidences that [he] is neither a flight risk nor a danger to community."  *Id.* at 10.  That all may be true as he describes the facts here.  But the law refers to crimes of violence—not crimes that judges determine were or were not "truly violent."  The jury convicted Johnson under § 111(b), an offense the law treats as a crime of violence.  That carries consequences for his pre- and post-sentencing detention.  His motion for release doesn't explain what constitutes the "clear and convincing" evidence he mentions in support of his argument.  Evidence that is not even apparent cannot be exceptional, either.

Finally, Johnson says he has exceptional "medical conditions"—namely, "hypertension, heart rate fluctuation, tinnitus, vertigo, claustrophobia, and white matter brain disease consisting of misfiring neurons and increased risk of aneurism or stroke."  *Id.* at 11.  Even assuming Johnson has these conditions, he cites no caselaw suggesting his conditions would satisfy § 3145(c), while the government cites a string of trial-court decisions suggesting they do not.  Response at 11.  Nor does he explain why his conditions can't be (or aren't already being) treated or mitigated in prison, or how they would improve upon the sort of temporary release he seeks here.  Johnson, moreover, provides no evidence that he can't obtain his "necessary" anxiety medication while in custody.  Motion for Release at 11.  And his preference for a "clean" diet is not an exceptional reason to justify his release.  So the Court denies his motion for release from custody pending his sentencing.

## ORDER

The Court denies Johnson's motions for a judgment of acquittal (DN 90), a new trial (DN 91), and release from custody pending sentencing (DN 94).

Benjamin Beaton, District Judge

United States District Court

November 8, 2022

17